# State of New York Court of Appeals

## MEMORANDUM

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 86
US Bank National Association,
&c.,
                Respondent,
            v.
Kenyatta Nelson, et al.,
                Appellants,
et al.,
                Defendants.

Jared B. Foley, for appellants.
Katherine Wellington, for respondent.
New York State Foreclosure Defense Bar, amicus curiae.

MEMORANDUM:

The order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

We conclude that, under the circumstances of this case, Supreme Court did not err in granting plaintiff's motions for summary judgment and for a judgment of foreclosure and sale. Defendants failed to raise standing in their answers or in pre-answer motions as required by CPLR 3211 (e) and accordingly, under the law in effect at the time of the orders appealed from, the defense was waived (*see Fossella v Dinkins*, 66 NY2d 162, 167 [1985]). Defendants' argument that ownership is an essential element of a foreclosure action, raised for the first time in support of their motion for reargument at the Appellate Division, is unpreserved for our review. We do not reach the issue of whether RPAPL 1302-a, enacted while this appeal was pending, affords defendants an opportunity to raise standing at this stage of the litigation. Defendants are free to apply to the trial court for any relief that may be available to them under that statute.

WILSON, J. (concurring):

The dispute here, which has roiled the lower courts, arises from a simple misnomer. Whether a plaintiff is a party to a contract – and therefore can sue for breach of contract – is not a question of "standing." New York law suggests that true standing must be pleaded as an affirmative defense. But whether a plaintiff is a party to a contract and, therefore,

can sue for breach, is not a question of standing – it is an essential element of a plaintiff's claim, which must be pleaded affirmatively in a complaint.

A promissory note is a contract. A suit to recover on a note or to foreclose on a mortgage securing that note is a contract action. Installment notes secured by a mortgage – which are what people commonly use to buy homes and other real property, and what is at issue here – have existed for centuries. It is only recently that the New York courts have used the term "standing" to refer to whether the plaintiff in a foreclosure action is a party to the contract (or other person with the right to enforce the contract).[1] The dispute and confusion as to whether the borrower must plead "lack of standing" as an affirmative defense arises purely from the misuse of the word "standing" to relate to the question of whether the plaintiff is the holder of the note.

Recognizing that borrowers have been saddled by this terminological mishap, the legislature stepped in, first in 2013, and again in 2019. In 2013, the legislature required that a plaintiff suing to foreclose on a home mortgage must "includ[e] the mortgage, security agreement and note or bond underlying the mortgage executed by defendant and

---

[1] NY UCC 3-301 provides that the person entitled to enforce a negotiable instrument can include: (i) the holder of the instrument, (ii) a nonholder in possession of the instrument who has the rights of a holder, or (iii) a person not in possession of the instrument who is entitled to enforce the instrument in limited circumstances specified in separate provisions of the UCC (*see also* Permanent Editorial Board for the Uniform Commercial Code, Report of the Permanent Editorial Board for the Uniform Commercial Code: Application of the Uniform Commercial Code to Selected Issues Relating to Mortgage Notes 4–7 [2011]). For simplicity's sake, I will refer to all persons legally able to enforce a negotiable instrument as "holders" or "owners."

all instruments of assignment" (CPLR 3012-b).[2]   Last December, the legislature, addressing the forfeitures caused by the courts' misuse of "standing," directed that the so-called issue of "standing" in foreclosure actions related to a home loan may be raised at any time prior to the entry of a judgment of foreclosure.  The legislature further directed that the legislation apply immediately, which would include this case.  In truth, the legislation is unnecessary, because a plaintiff suing to foreclose on a mortgage or to sue on a promissory note has the affirmative obligation to plead (and prove, if put at issue) that it is the holder of the note forming the basis of the suit.

Here, U.S. Bank's complaint properly alleged that it was the holder of the note executed by the Nelsons.  (The foreclosure action predated CPLR 3012-b's enactment, so U.S. Bank was not obligated to provide the required documentation when it commenced the foreclosure action.)  The Nelsons, whose loan originated with a completely different and unrelated lender, appropriately answered that they lacked knowledge or information as

---

[2] The legislation enacting CPLR 3012-b was "introduced at the request of the Chief Judge of the State and the Attorney General" to ensure that before commencing a residential foreclosure action, plaintiff's counsel "must be assured that the plaintiff . . . holds the instrument of indebtedness in the action" and "must attach to the [complaint or attorney's] certificate copies of the relevant instruments of indebtedness and any instruments of modification, extension, consolidation and assignment" (Senate Introducer's Mem, Bill Jacket L 2013, ch 306 at 11).  The Office of Court Administration explained that the legislation "was an appropriate public policy response to the crisis in foreclosure cases" because it would ensure that "all of the instruments of indebtedness underpinning these actions, and all instruments of assignment, if any, are in place at the commencement of the action" (Mem from Marc Blaustein, Office of Court Administration, Bill Jacket L 2013, ch 306 at 24).  The requirements contained in CLPR 3012-b mirror the traditional requirement of "presentment" for the payment of negotiable instruments (UCC 3-501 [b][2][i]; NY UCC 3-505).

to whether U.S. Bank was the holder of the note under which they were obligated.  Under ordinary rules of civil procedure, that answer put U.S. Bank on notice that it would have to prove that it held the note.[3]

I concur in the result here for a reason unrelated to the standing fiasco: in moving for summary judgment, U.S. Bank tendered evidence that it was the holder of the note. The Nelsons did not offer any contrary proof or any argument that the proof was deficient. Accordingly, Supreme Court properly granted summary judgment in favor of U.S. Bank.

I.

---

[3] The Nelsons fully preserved the question of whether their answer was sufficient to put U.S. Bank's ownership of the note at issue. Supreme Court's order of December 15, 2015, from which the Nelsons appealed, states: "If Defendant's [sic] answer were deemed to raise an issue of standing, the Court's grant of summary judgment resolved that issue.  If the issue was not raised by the answer, then the standing defense was waived."  In the Nelsons' Request for Appellate Division Intervention form, they identified the second issue on appeal as: "defendants sufficiently put plaintiff's lack of standing at issue in their Verified Answers and it was incumbent on the Court to verify whether plaintiff had standing to commence this action."  They repeated that issue in their CPLR 5531 statement in the Appellate Division and in the questions presented in their opening brief to that court.  The Appellate Division's opening paragraph identified the issue for decision as: "whether, in a mortgage foreclosure action in which the complaint alleges that the plaintiff is the owner and holder of the note and mortgage, the mere denial of that allegation in the answer, without more, is sufficient to assert that the plaintiff lacks standing, thereby preserving that issue for adjudication."  That issue, which I discuss at length, is therefore fully preserved. By denying knowledge or information that U.S. Bank had "standing" to sue, the Nelsons directly put at issue whether U.S. Bank was the holder of their note.  The purportedly unpreserved question – whether "ownership is an essential element of a foreclosure action" (majority opinion at 2) – has been settled for centuries.  Tarring the Nelsons for not stating that settled proposition is sophistry: they clearly put at issue whether U.S. Bank held their note.

Both appellants and respondents frame the pivotal issue in terms of what they refer to as "standing," by which they mean whether the Nelsons' denial of US Bank's assertion that it is the holder of their note was sufficient to put at issue whether U.S. Bank was the holder of the note on which it sued at the time it sued. The actual doctrine of standing has nothing to do with this case – or with any foreclosure action.

Standing comes in two flavors: constitutional and prudential. The former is derived from the Case or Controversy Clause of article III, § 2 of the United States Constitution, and has three elements; injury in fact, causation and redressability (*Lujan v Defenders of Wildlife*, 504 US 555, 560–561 [1992]). The United States Supreme Court has defined injury in fact as "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not 'conjectural' or 'hypothetical'" (*id*. at 560, quoting *Whitmore v Arkansas*, 495 US 149, 155 [1990]). The New York Constitution contains no case or controversy requirement; hence, federal constitutional standing doctrine is of little or no relevance. [4]

In contrast, prudential standing is "not derived from Article III and 'not exhaustively' defined" (*Lexmark Intern., Inc. v Static Control Components, Inc.,* 572 US 118, 126 [2014], quoting *Elk Grove Unified Sch. Dist. v Newdow*, 542 US 1, 12 [2004];

---

[4] Note that state courts are not bound to adhere to federal standing requirements (*see, e.g., ASARCO Inc. v Kadish*, 490 US 605, 617 [1989] ["We have recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability even when they address issues of federal law, as when they are called upon to interpret the Constitution or […] a federal statute"]; *see also* Brian A. Stern, *An Argument Against Imposing the Federal "Case or Controversy" Requirement on State Courts*, 69 NYU L Rev 77 [1994]).

*see also* Charles Alan Wright et al., 33 Fed Prac & Proc Judicial Review § 8343 [Oct 2020 update]).  Though not bound by federal doctrine on prudential standing, our Court has adopted the prudential requirement that "a party must show that the in-fact injury of which it complains … falls within the 'zone of interests,' or concerns, sought to be promoted or protected by the statutory provision under which the agency has acted" (*Society of Plastics Indus., Inc. v County of Suffolk*, 77 NY2d 761, 773 [1991]).[5]

Standing comes into play when parties aim to enforce public — as opposed to private — rights.[6] The doctrine emerged in response to a growing administrative state and the increasing use of litigation to "enforce public, primarily constitutional values" (William A. Fletcher, *The Structure of Standing*, 98 Yale L J 221, 225 [1988]). At the height of the *Lochner* era, certain judges, particularly Justice Brandeis, sought to limit judicial intervention in the legislative process and protect Progressive Era legislation from attack (Cass R. Sunstein, *Standing and the Privatization of Public Law*, 88 Colum L Rev 1432, 1437–1438 [1988]; Cass R. Sunstein, *What's Standing After Lujan? Of Citizen Suits, "Injuries," and Article III*, 91 Mich L Rev 163, 179 [1992]; *see also* Daniel E. Ho & Erica L. Ross, *Did Liberal Justices Invent the Standing Doctrine? An Empirical Study of the Evolution of Standing*, 62 Stan L Rev 591 [2010]). In a series of taxpayer standing cases, the U.S. Supreme Court drew on the law of equity, namely the requirement that plaintiffs

---

[5] There is a hint in *Society of Plastics* that New York separation of powers concepts might animate a New York doctrine of constitutional standing – an intriguing question not relevant here (77 NY2d at 772–773).

[6] Public rights are those "held collectively by the community," while private rights are those "held by individuals" (F. Andrew Hessick, *Standing, Injury in Fact, and Private Rights*, 93 Cornell L Rev 275 [2008]).

assert an interest or right that a court of equity could enforce, to reject constitutional challenges to legislation (Steven L. Winter, *The Metaphor of Standing and the Problem of Self-Governance*, 40 Stan L Rev 1371, 1422, 1441–1449 [1988]). Although the term "standing" was employed in the 19th Century as shorthand for that question, it was not explicitly linked to the case or controversy requirement until Justice Frankfurter's concurring opinion in *Coleman v Miller* (*id.* at 1422, 1449).[7]

The rise of impact litigation at midcentury brought standing back to the forefront of the Supreme Court's jurisprudence (*see generally* Abram Chayes, *Public Law Litigation and the Burger Court*, 96 Harv L Rev 4 [1982]).[8] The major standing cases since the 1960s generally involve private individuals or organizations challenging government policies and practices (*see, e.g., Flast v Cohen*, 392 US 83 [1968]; *Schlesinger v Reservists Comm. to Stop the War*, 418 US 208 [1974]; *City of Los Angeles v Lyons*, 461 US 95 [1983]; *Allen v Wright*, 468 US 737 [1984]; *Clapper v Amnesty Intl.*, 568 US 398 [2013]).[9] Like their predecessors, more recent jurists have expressed concern these suits transformed judges into legislators and violated the separation of powers, a process described by Justice Scalia

---

[7] *But see* Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich L Rev 689 (2004) (arguing that American courts developed an active law of standing in the 18th and 19th Centuries with constitutional dimensions that is consistent with the modern doctrine).

[8] Indeed, more than half of the cases considering the doctrine in the Court's history have been decided since 1985 (Sunstein, *What's Standing After Lujan? Of Citizen Suits, "Injuries," and Article III*, 91 Mich L Rev at 169).

[9] Separate lines of cases address the standing of legislative actors to sue state agencies (*see INS v Chadha*, 462 US 919 [1983]; *Raines v Byrd*, 521 US 811 [1997]; *Arizona State Legislature v Arizona Ind Redistricting Commn.*, 576 US 787 [2015]), and states to sue the federal government (*see, e.g., Massachusetts v EPA*, 549 US 497 [2007]).

as the "overjudicialization of the processes of self-governance" (Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U L Rev 881, 881 [1983]). The judicial power, they argued, should be restricted to resolving disputes that were "traditionally amenable to, and resolved by, the judicial process" (*Vermont Agency of Natural Resources v United States ex rel Stevens*, 529 US 765, 774 [2000]). In accordance with that view, the U.S. Supreme Court has significantly limited who can bring suit to challenge government action and what kind of relief they can seek (*see, e.g., Lujan*, 504 US at 565 [reasoning that profession of an intent to travel to observe endangered species in the future do not support a finding of "actual or imminent" injury sufficient to establish standing]; *Clapper*, 568 US at 415–417 [rejecting argument that human rights activists' "costly and burdensome measures" to avoid government of surveillance constitute an ongoing injury]).

Our decisional law on standing treats it as a prudential issue focused on the enforcement of public rights – typically, whether a plaintiff has suffered some injury and "is arguably within the zone of interest to be protected by the statute" or regulation (*Dairylea Coop, Inc. v Walkley*, 38 NY2d 6, 9 (1975); *see also Matter of Acevedo v New York State Dept. of Motor Vehicles*, 29 NY3d 202 [2017] [holding plaintiffs had standing to challenge DMV regulation]; *Matter of Sierra Club v Village of Painted Post*, 26 NY3d 301 [2015] [holding plaintiff had standing to challenge governmental land use decision]; *Matter of Colella v Board of Assessors*, 95 NY2d 401 [2000] [concluding that taxpayers lack standing to challenge tax exemption granted to a temple]). "Standing is a threshold determination, resting in part on policy considerations, that a person should be allowed

access to the courts to adjudicate the merits of a particular dispute that satisfies the other justiciability criteria" (*Society of Plastics Indus., Inc.*, 77 N.Y.2d at 769). Needless to say, when someone purporting to be a party to a contract sues to enforce that contract, no issue of standing is involved. You're either a party to the contract or not.

Standing has increasingly been misapplied in cases where private rather than public rights are at issue (*see* Charles Alan Wright et al., 13A Fed Prac & Proc Juris § 3531 [Oct 2020 update] ["The fascination of complex standing doctrine and the concern to observe constitutional limits on the judicial power occasionally lead courts to invoke public-law concepts to resolve concerns that are better addressed through private-law concepts. . . . It would be better to rely directly on cause-of-action, real-party-in-interest, capacity, intervention, and like concepts"]). The U.S. Supreme Court likewise cautioned against confusing standing with the existence of a cause of action:

> "[T]he distinct concepts [of standing and cause of action] can be difficult to keep separate. If, for instance, the person alleging injury is remote from the zone of interests a statute protects, whether there is a legal injury at all and whether the particular litigant is one who may assert it can involve similar inquiries . . . Still, the question whether a plaintiff states a claim for relief 'goes to the merits' in the typical case, not the justiciability of a dispute, and conflation of the two concepts can cause confusion (*Bond v US*, 564 US 218–219 [2011])."

Substituting standing for the proper inquiry confuses the legal principle at issue. This is such a case.

## II.

The law of negotiable instruments has been four centuries in the making. The use of negotiable instruments, particularly the bill of exchange, became common in England

following Parliament's repeal of the ban on charging interest in 1623 (Ann M. Burkhart, *Lenders and Land*, 64 Mo L Rev 249, 261 [1999]). Easily transportable and readily exchangeable, the bill of exchange became a stand-in for currency (*id.*). By the close of the 17th Century, common law had recognized the right of purchasers to enforce bills of exchange, laying the foundation for the doctrine of holder in due course (*id.*). In 1704, the Statute of Anne provided that promissory notes properly indorsed, like bills of exchange, could be enforced by bona fide purchasers, and sixty years later, in *Grant v Vaughan*, Lord Mansfield recognized promissory notes as negotiable instruments (Frederick K. Beutel, *The Development of Negotiable Instruments in Early English Law*, 51 Harv L Rev 813, 844 [1938]). The Statute of Anne was adopted by most American states, and when the term "bona fide purchaser" was replaced with "holder in due course" by the English Bills of Exchange Act in 1882, American law followed suit (Burkhart at 263).

Since their inception, negotiable instruments have been understood as contracts, a fact recognized by this Court (*Oddo Asset Mgt. v Barclays Bank PLC*, 19 NY3d 584, 593 [2012] ["A debtor and a creditor have no special relationship of confidence and trust . . . and the relationship is generally controlled by contract"]; *see also* Official Comment 3 to NY UCC 3-119 ["As between the immediate parties a negotiable instrument is merely a contract]). Holders of notes sue for breach of contract when the borrower fails to pay.

Negotiable instruments differ from other contracts in a way germane to this case: ordinarily, the parties to a contract remain static and are known to each other. Negotiable instruments by definition are meant to be bought, sold and traded, so that the "drawer" or "obligor" on the note (the person who promises to pay back the money) may not, down the

road, have any idea who holds the note and, consequently, to whom the money is presently owed. When a negotiable instrument is an installment note, such as a typical home mortgage, the persons entitled to receive the payments may change over time, even repeatedly. For that reason, proof that the plaintiff is the current holder of the defendant's note is much more frequently at issue in suits involving negotiable instruments than suits involving other types of contracts.

The law governing that determination is not our jurisprudence on standing but rather the law of negotiable instruments, codified in New York's Uniform Commercial Code. NY UCC 3-301 makes it clear that the holder of the note is entitled to enforce it, and so courts must determine whether the plaintiff is in "possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession" (NY UCC 1-201 [b] [21] [A]). A purchaser of a note becomes the holder through negotiation (NY UCC 3-202). "If the instrument is payable to order it is negotiated by delivery with any necessary indorsement; if payable to bearer it is negotiated by delivery" (*id.*). Therefore, the issue of what documentation is necessary to establish a plaintiff's right to demand payment on a negotiable instrument is properly understood as a question of whether the note in question has been *negotiated* such that the plaintiff becomes the holder (*see* 80 NY Jur 2d Negotiable Instruments § 269 [2d ed 2013] ["The mere possession of a promissory note endorsed in blank, just like a check, provides presumptive ownership of that note by the current holder; such is the foundation of negotiable instruments law. Assuming that execution of a negotiable instrument if put in issue has been proved, its possession and production at the trial of the action to enforce it is sufficient prima facie

proof of the plaintiff's ownership. This is the rule applicable to an instrument payable to bearer or indorsed in blank"]). [10]

Our seminal jurisprudence in this area does not reference standing, instead framing the question whether the plaintiff has produced proof that the negotiable instrument had been assigned to it (*Merritt v Bartholick*, 36 NY 44, 44 [1867] [holding that third party assignee of mortgage "obtained no interest in the mortgage" in the absence of the assignment of the bond]; *Payne v Wilson*, 74 NY 348, 354–355 [1878] [reasoning that plaintiff who was not expressly assigned mortgage had right to foreclose because an "assignment of the debt transferred the interest of the owner of it in the land mortgaged"]; *Bergen v Urbahn*, 83 NY 49, 50 [1880] [concluding that plaintiff who failed to produce the note "was not entitled to recover"]). As recently as 1998, the Appellate Division affirmed the dismissal of a foreclosure action on the grounds that plaintiff "had no legal or equitable interest" in a mortgage that had been assigned to a third party; the court did not mention standing (*Katz v East-Ville Realty Co*, 249 AD2d 243 [1st Dept 1998]; *see also Kluge v Fugazy*, 145 AD2d 537, 538 [2d Dept 1988] ["The plaintiff's first and second causes of action for foreclosure and deficiency judgment, respectively, must fail since foreclosure of a mortgage may not be brought by one who has no title to it and absent transfer of the debt, the assignment of the mortgage is a nullity"]).

---

[10] The key issue in *JP Morgan Chase Bank, NA v Caliguri* is described by the Court as whether the plaintiffs met their burden of showing they had standing to foreclose (— NY3d — [2020] [decided today]). For the reasons set out herein, the issue in that case is also not one of standing, but whether JP Morgan Chase was the holder of the note in question and therefore had the right to enforce it.

## III.

Although New York courts occasionally used the term "standing" to refer to the question of whether a plaintiff is the holder of a note prior to the financial crisis of 2008,[11] the vast majority of such cases arose in its aftermath. Borrowers began to raise "standing" as a defense in part because the process of securitization, particularly the transfer of notes and mortgages to new entities, made it more difficult to ascertain the identity of the note holder at the time of default (*see, e.g., US Bank, NA* v *Collymore,* 68 AD3d 752 [2d Dept 2009]; *see also* Adam J. Levitin, *The Paper Chase: Securitization, Foreclosure, and the Uncertainty of Mortgage Title*, 63 Duke LJ 637 [2013]; Mark C. Dillon, *Unsettled Times Make Well-Settled Law: Recent Developments in New York State's Residential Mortgage Foreclosure Statutes and Case Law*, 76 Alb L Rev 1085 [2013]).

The Nelsons' case is an archetypical illustration of the uncertainty generated by the securitization process. The Nelsons initially executed a note in favor of Knightsbridge Mortgage Bankers, and a mortgage in favor of the Mortgage Electronic Registration Systems (MERS). MERS is a private mortgage registry system created in the early 1990s to track ownership and servicing interests in mortgages, thereby reducing the transaction costs that arise from registering mortgages in public land records systems (Levitin at 649, 677–676).[12] The note changed hands at least twice, passing from Knightsbridge to Wells

---

[11] *See, e.g., Slutsky v Blooming Grove Inn, Inc.*, 147 AD2d 208, 211–212 (2d Dept 1989).
[12] *See also Matter of Merscorp, Inc. v. Romaine*, 8 NY3d 90, 104 (2006) (Kaye, Ch. J., dissenting) (arguing MERS "may also function, perhaps unintentionally, to insulate a noteholder from liability, mask lender error and hide predatory lending practices").

Fargo before it was indorsed in blank and sold, according to the plaintiffs, to the Deutsche ALT-A Securities Mortgage Loan Trust, of which US Bank is the trustee.

In the past decade, New York courts have firmly adopted the mistaken use of the word "standing" to refer to questions about whether the plaintiff in a foreclosure action holds the defendant's note. The consequence of that mislabeling has caused many courts to hold that the note's obligor (the homeowner, typically) must plead "lack of standing" as an affirmative defense (*see, e.g., Security Pacific Natl. Bank v Evans*, 31 AD3d 278, *Wells Fargo Bank Minnesota, Natl. Assn. v Mastropaolo*, 42 AD3d 239, 244 [2d Dept 2007]; *Nationstar Mortg., LLC v Alling*, 141 AD3d 916, 917 [3d Dept 2016]; *JPMorgan Chase Bank, Nat. Assn. v Kobee*, 140 AD3d 1622, 1623 [4th Dept 2016]), while others have held the contrary (*Nationstar Mtge., LLC v Wong*, 132 AD3d 825, 826 [2d Dept 2015]; *US Bank, Natl. Assn. v Faruque*, 120 AD3d 575, 576 [2d Dept 2014]).

As to true, prudential standing, although some cases hold otherwise, the weight of the authority suggests that standing must be pleaded as an affirmative defense (*See Santoro v Schreiber,* 263 AD2d 953, 954 [4th Dept 1999] ["Respondents waived any objection to petitioner's standing because they did not raise the defense of lack of standing either in a pre-answer motion or in their responsive pleadings"]; *Klein v Garfinkle*, 12 AD3d 604, 605 [1st Dept 2004] ["(A)s the issue of standing was not raised as an affirmative defense in an answer or in the pre-answer motions to dismiss the petition, the issue was waived"]; *see also* 3 Carmody-Wait 2d § 19:10 [Nov 2020 update]). [13] The prevailing view that true

---

[13] Our decisions in *Fossella v Dinkins*, 66 NY2d 162 (1985) and *Dougherty v Rye*, 63 NY2d 989 (1984) have been cited as holding that true standing must be pleaded as an affirmative

standing must be pleaded as an affirmative defense, when combined with the misuse of

"standing" in mortgage foreclosure actions, has led courts to hold that the failure of a

homeowner to plead affirmatively the plaintiff is not the noteholder waives any challenge

on that issue. Courts now regularly and erroneously describe that issue as "standing," when

the question really is whether the plaintiff holds the note, and therefore possesses a cause

of action.

> "CPLR 3018 (b), which governs affirmative defenses, reads:
>
> A party shall plead all matters which if not pleaded would be likely to take the adverse party by surprise or would raise issues of fact not appearing on the face of a prior pleading such as arbitration and award, collateral estoppel, culpable conduct claimed in diminution of damages as set forth in article fourteen A, discharge in bankruptcy, facts showing illegality either by statute or common law, fraud, infancy or other disability of the party defending, payment, release res judicata, statute of frauds, or statute of limitation. The application of this subdivision shall not be confined to the instances enumerated."

A fundamental requirement of any breach-of-contract action is for the plaintiff to allege

that it is a party to the contract (or has acquired the rights of a party). Moreover, whatever

arguments might be made about whether CPLR 3018 (b) requires true standing to be

pleaded as an affirmative defense, the chain of indorsements on a note entitling the plaintiff

to foreclose on a mortgage is nothing that would take the plaintiff by surprise – it is

---

defense (*see, e.g.*, David D. Siegel & Patrick M. Connors, New York Practice § 223 [6th ed 2018]). However, those decisions hold that review by our Court was "waived" by the failure to raise standing in either an affirmative defense or in a CPLR 3211 motion. Those decisions do not expressly hold that standing must be pleaded as an affirmative defense. Indeed, because the issue of standing was not raised in the court of instance in those cases, our preservation rules would prevent us from making any holding about the need to plead standing as an affirmative defense unless, of course, standing was jurisdictional, but in that case it could not have been waived. Those holdings do, however, confirm that our standing doctrine is prudential, not jurisdictional.

information principally in the possession of the plaintiff and often unknown to the defendant. CPLR 3012-b expressly recognizes that fact by requiring the noteholder to provide proof of ownership of the note at the time it commences an action.

In any event, given the holdings of numerous courts that the failure to plead lack of standing as an affirmative defense in mortgage foreclosure actions disabled borrowers from determining whether the plaintiff really was the present noteholder, the legislature modified the Real Property Actions and Proceedings Law. Adopting the "standing" language pervasive in recent judicial decisions, the RPAPL now provides that "any objection or defense based on the plaintiffs lack of standing in a foreclosure proceeding related to a home loan . . . shall not be waived if a defendant fails to raise the objection or defense in a responsive pleading or pre-answer motion to dismiss" (§ 1302-a). As warned by the Supreme Court in *Bond*, misapplication of the standing doctrine confuses a merits question — whether the plaintiff holds the note and, as such, has the right to enforce it — with a threshold determination of justiciability. Our legislature has intervened twice to undo that confusion.

IV.

Returning to the question at the crux of this case, U.S. Bank affirmatively pleaded that a mortgage executed by the Nelsons as security for a $660,000 loan had been assigned to it in its capacity as trustee for Deutsche ALT-A Securities Mortgage Loan Trust in August of 2009 and that it was the holder of the Nelsons' note. Ordinary rules of pleading in contract actions required US Bank to do so. The Nelsons answered that they lacked "knowledge or information sufficient to form a belief as to the truth of the allegations" as

to U.S. Bank's allegation that it held the note and mortgage. It is hardly surprising that the Nelsons did not know whether their note had been negotiated, and US Bank cannot possibly claim surprise that its ownership of the note and mortgage was put to proof (*see* 80 NY Jur 2d, Negotiable Instruments § 700 [2d ed 2013] ["As in other actions, a general denial usually puts in issue every material allegation on the complaint on a negotiable instrument. It goes to the root of the cause of action and permits the introduction of any proper evidence tending to controvert the facts which the plaintiff must establish to sustain his or her case"]). Indeed, U.S. Bank understood that its ownership of the note and mortgage was at issue, and tendered proof of such when it moved for summary judgment. Because the question of whether U.S. Bank is the holder of a negotiable instrument has nothing to do with standing and is, instead, an essential element of the holder's claim the Nelsons were not required to raise it as an affirmative defense.[14] In this case, the issue of whether the plaintiff was the noteholder was properly before the court in exactly the way it should have been raised.

However, the Nelsons have an unrelated, dispositive problem. When U.S. Bank moved for summary judgment, it attached the Nelsons' note, indorsed in blank, the mortgage, and the assignment of the mortgage. Doing so established, *prima facie*, U.S.

---

[14] Note that under NY UCC 3-505, a party to whom presentment of a negotiable instrument is made "may without dishonor require (a) exhibition of the instrument; and (b) reasonable identification of the person making presentment and evidence of his authority to make it if made for another." The UCC also provides that "failure to comply with any such requirement invalidates the presentment but the person presenting has a reasonable time in which to comply and the time for acceptance or payment runs from the time of compliance" (NY UCC 3-505 [2]).

Bank's right to judgment as a matter of law. To defeat U.S. Bank's motion for summary judgment, the Nelsons were required to adduce admissible facts controverting U.S. Bank's proof of ownership (*see, e.g., Deutsche Bank Natl. Trust Co. v Monica*, 131 AD3d 737, 740 [3d Dept 2015]).  That they utterly failed even to attempt to do.  U.S. Bank, therefore, was entitled to summary judgment.

Although I can join neither the majority's rationale nor the numerous courts' mistaken treatment of negotiable instrument ownership as a question of standing, I concur in the result.

Order affirmed, with costs, and certified question answered in the affirmative, in a memorandum. Chief Judge DiFiore and Judges Rivera, Stein, Fahey, Garcia and Feinman concur. Judge Wilson concurs in result in an opinion.

Decided December 17, 2020